**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NATHANIEL CLARK, <br>     Plaintiff, <br><br>     v. <br><br> MARK BOUGHTON, in his official <br> capacity as Commissioner of the <br> Department of Revenue Services, <br><br> JOHN BIELLO, individually, and in his <br> official capacity as Acting Commissioner of <br> the Department of Revenue Services, and <br><br> LOUIS BUCARI, JR., individually, and in <br> his official capacity as First Assistant <br> Commissioner of the Department of <br> Revenue Services, <br>     Defendants. | No. 3:21-cv-1372 (SRU) |

**RULING AND ORDER ON MOTIONS TO DISMISS**

On February 21, 2020, plaintiff Nathaniel Clark ("Clark") excoriated First Assistant

Commissioner of Revenue Services Louis Bucari, Jr. ("Bucari") before a legislative committee.

A month later, Clark filed a Freedom of Information Act request seeking communications

between Bucari and then-Acting Commissioner of the Department of Revenue Services ("DRS")

John Biello ("Biello").  On October 13, 2020, Clark's wife ("Mrs. Clark") was terminated from

her employment as an attorney for the state of Connecticut.  Clark now brings suit against Biello

and Bucari, in their individual and official capacities, as well as current DRS Commissioner

Mark Boughton in his official capacity, alleging that that the Defendants terminated his wife in

retaliation for his legislative testimony and FOI request.  The Defendants, in turn, have moved to

dismiss Clark's complaint for lack of standing and failure to state a claim.  For the following

reasons, I grant in part and deny in part the motion to dismiss by the Defendants acting in their

individual capacities, and I grant the motion to dismiss filed by the Defendants acting in their official capacities.

## I.   Background

Clark is a private citizen from Glastonbury, Connecticut.  Until October 13, 2020, Mrs. Clark was employed as an attorney for the state of Connecticut, presumably at DRS.[1]

Defendant Mark Boughton ("Boughton") is the current Commissioner of the Department of Revenue Services ("DRS Commissioner").  At all relevant times, Defendant Biello was the then-Acting Commissioner or Deputy Commissioner of Revenue Services.  At all relevant times, Defendant Bucari was the First Assistant Commissioner of Revenue Services.  Together, they are "Defendants."

### A.   Allegations[2]

To understand the allegations giving rise to this lawsuit, it helps to first understand the role of the First Assistant Commissioner of Revenue Services, a role defined in statute as an attorney "in charge of succession and transfer taxes."  Conn. Gen. Stat. § 12-389(a).

Until 2005, the State of Connecticut imposed two kinds of taxes on the value of bequeathed property: a succession tax, as defined in Chapter 216 of Title 12 of the Connecticut General Statutes, and an estate tax.  In 2005, the legislature repealed the succession tax and

---

[1] Clark alleges that Mrs. Clark worked for "the state" rather than DRS specifically.  However, I infer that she worked for DRS because Clark alleges that Biello of DRS fired her.

[2] A district court may consider certain materials without converting a motion to dismiss into one for summary judgment, including matters of which judicial notice may be taken, any statements or documents incorporated in the complaint by reference, or any document that is not attached or incorporated by reference "where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (citations omitted).  In the recitation of the allegations, the Court supplemented the pleadings with Clark's legislative testimony (a subject of this litigation) and Raised Bill 5050 (the subject of Clark's legislative testimony), both of which are incorporated in the complaint by reference and subject to judicial notice.

replaced it with an expanded estate tax.  *See* Conn. Pub. Act 05-251, *codified in* Conn. Gen. Stat.

§ 12-340 (sunsetting the succession tax); *see also* Judith Lohman, *Legislative History of the*

*Connecticut Estate Tax Since 2001*, Off. Leg. Rsrch., 2010-R-0226 (May 26, 2010),

https://www.cga.ct.gov/2010/rpt/2010-R-0226.htm.  Nevertheless, despite Chapter 216's general

repeal, the chapter continues to authorize the position of First Assistant Commissioner of

Revenue Services.  Conn. Gen. Stat. § 12-389(a).  In addition, Section 12-389 authorizes DRS,

with the consent of the Attorney General, to appoint its own counsel to represent the agency in

certain appeals in Connecticut courts.  *Id.* § 12-389(b).

About fifteen years after the succession tax was repealed, the Connecticut General

Assembly's Judiciary Committee introduced Raised Bill 5050 ("R.B. 5050" or "the proposed

bill"), in February 2020.  *An Act Concerning the Duration and Release of Estate and Probate*

*Fee Liens and the Repeal of Chapter 216 of the General Statutes*, R.B. 5050, Session Year 2020

(2020) (L.C.O. No. 714).  Section 5 of R.B. 5050 addressed the position of First Assistant

Commissioner of Revenue Services.  Specifically, it proposed relocating the statutory

authorization for the position to Chapter 201, the section of the General Statutes regulating the

Department of Revenue Services, and converting the position to an exempt appointee of the

Commissioner rather than one subject to classified service.  *Id.*

On February 21, 2020, Clark testified before the Connecticut General Assembly's

Judiciary Committee in support of R.B. 5050.  Compl., Doc. No. 1, at 4.  Clark alleges that he

testified "in support of proposed legislation," and that he spoke about and advocated for the

removal of a "wasteful position" at DRS.  *Id.*  Reading between the lines of Clark's testimony,

however, it would be more accurate to characterize the commentary as a rhetorical attack on

Bucari.  *See An Act Concerning the Duration and Release of Estate and Probate Fee Liens and*

*the Repeal of Chapter 216 of the General Statutes*: Hearing on R.B. 5050 Before the Judiciary

Committee, Session Year 2020 (2020) (statement of Nathaniel Clark) ("the Testimony").  The

Testimony begins by introducing Clark as a "Connecticut citizen," "concerned taxpayer," and

supporter of R.B. 5050.  Clark praises R.B. 5050, then asserts that the "the only reason" that it

has "not yet passed" is that DRS wants to "keep" Section 12-389 "alive."  Clark makes clear that

he only supports the reforms as they are "currently written" in the proposed legislation.

At that point, the Testimony takes a turn.  Regarding DRS's ability to represent itself in

court, Clark suggests that the Attorney General may want to revoke the grant of authority

because DRS attorneys' "shortcomings" have resulted in "recent losses."  As evidence, Clark

singles out a case litigated by Bucari, *Sobel v. Comm'r of Revenue Servs.*, 333 Conn. 712 (2019).

Regarding the position of First Assistant Commissioner, Clark indicates that he would "strongly

object" to "any attempts by the unappointed Acting Commissioner of DRS [Biello] to change

[the proposed bill] to protect an individual.  Especially an individual as problematic as

. . . Bucari."  Clark is "outraged," he says, that Connecticut taxpayers have "already paid

[Bucari] $2 million over the last ten years" to administer the repealed succession tax.  Further, he

notes, Bucari's salary "d[id] not even include all of the payments that have been made to settle

the various [Commission on Human Rights and Opportunities] complaints that have been filed

against him."  To conclude, Clark argues that the only acceptable alteration to section 5 of the

proposed bill would be eliminating Bucari's position altogether, because "[t]he idea that section

5 might be changed to protect [Bucari] is galling."

Soon after testifying, on March 4, 2020, Clark filed a Freedom of Information Act

request seeking unspecified communications between Biello and Bucari.  Compl., Doc. No. 1, at

4.  DRS was "less than forthcoming"; as a result, Clark subsequently appealed to the Connecticut

4

Freedom of Information Commission.  *Id.*   Clark alleges without elaboration that "[d]uring [the FOI] process, Biello gave evidence that my protected speech and action were part of the reason for the firing of [Clark's] wife."  *Id.*

On October 13, 2020, Biello, "conspiring with Louis Bucari," fired Mrs. Clark and terminated her employment at DRS as "retribution" for Clark's testimony.  *Id.*

B. Procedural History

On October 15, 2021, Clark filed a *pro se* civil rights complaint alleging that Mrs. Clark was fired in retaliation for Clark's protected speech.  *Id.*  Clark asserts that he has suffered (1) intimidation, (2) loss of healthcare coverage, (3) loss of spousal income, (4) loss of retirement income, and (4) increased medical expenses due to stress.  *Id.* at 5.  He seeks Biello's disbarment, Biello's removal and preclusion from future state employment, and Biello's earnings since his wife's firing; Bucari's disbarment, Bucari's removal and preclusion from future state employment, and Bucari's earnings from private practice of law and public employment since his wife's firing; damages of no less than $7 million, which he attributes to, *inter alia*, lost healthcare coverage, spousal income, and stress; and "any other remedies allowed under the law."  *Id.*

On November 10, 2021, defendants Biello and Bucari in their individual capacities ("the Individual Capacity Defendants") moved to dismiss all claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[3]  Indiv. Defs.' Mot. to Dismiss, Doc. No. 17.[4]  Clark opposed the motion, and the Individual Capacity Defendants replied.  Docs. No. 27, 31.

---

[3] They also moved stay discovery until after I ruled on the motion to dismiss, which I liberally granted pursuant to *Siegert v. Gilley*, 500 U.S. 226, 231 (1991) (requiring a trial court to find a violation of a clearly-established right before allowing discovery to proceed).  Docs. No. 18, 26.

[4] This document is only labeled "Defendants' Motion to Dismiss."  *See* Doc. No. 17.  However, Defendants subsequently refer to the motion as the "Individual Capacity Defendants' Motion to Dismiss."  *See* Doc. No. 33. Accordingly, I do, too.

On November 30, 2022, Defendants Boughton, Biello and Bucari in their official

capacities ("Official Capacity Defendants") also moved to dismiss all claims pursuant to Rules

12(b)(1) and 12(b)(6).[5]  Off. Defs.' Mot. to Dismiss, Doc. No. 33.  Clark opposed the motion.

Doc. No. 36.  The Official Capacity Defendants replied.  Doc. No. 37.

No party requested oral argument on the motions to dismiss.  I decide the motions

without it.  *See* Local R. Civ. P. 7(a).

## II.    Standard of Review

### A.    Federal Rule of Civil Procedure 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v.*

*United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A party that moves to dismiss for lack of

subject matter jurisdiction "may refer to evidence outside the pleadings."  *Id.*  The party who

seeks to invoke a court's jurisdiction bears the burden of establishing that jurisdiction.

*Thompson v. Cnty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (citing *Warth v. Seldin*, 422 U.S.

490, 518 (1975)).  To survive a motion brought under Rule 12(b)(1), a plaintiff must allege facts

demonstrating that the plaintiff is a proper party to seek judicial resolution of the dispute.  *Id.*  "A

district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject

matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,'" such

as when "the plaintiff lacks constitutional standing to bring the action."  *Cortlandt Street*

*Recovery Corp. v. Hellas Telecommunications*, 790 F.3d 411, 416–17 (2d Cir. 2015) (internal

---

[5] In addition, the Official Capacity Defendants originally contested service of process and moved to dismiss
pursuant to Rules 12(b)(2), 12(b)(4), 12(b)(5), and 12(h)(3).  *See* Off. Defs.' Mem. of Law, Doc. No. 33-1, at 9-11.
On April 8, 2022, after the Court entered an order extending the deadline for service of process, the Official
Capacity Defendants indicated that they no longer contested service of process.  Doc. No. 39.  Thereafter, they
withdrew their argument regarding defective service as moot.  Doc. No. 40.  They re-asserted the other bases for
dismissal.  For that reason, I do not address the Rule 12(b)(5) argument here.

citations omitted).  "The plaintiff bears the burden of 'alleg[ing] facts that affirmatively and

plausibly suggest that it has standing to sue.'"  *Id*. (internal citations omitted).

"[S]tanding cannot be 'inferred argumentatively from averments in the pleadings,' but

rather 'must affirmatively appear in the record.'"  *Martinez v. Malloy*, 350 F. Supp. 3d 74, 84 (D.

Conn. 2018) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 232 (1990)).

In considering a Rule 12(b)(1) motion to dismiss for lack of standing, the Second Circuit

construes "the complaint in [the] plaintiff's favor and accept[s] as true all material factual

allegations contained therein."  *Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 173 (2d

Cir. 2012); *see also Wiltzius v. Town of New Milford*, 453 F. Supp. 2d 421, 429 (D. Conn. 2006)

("In considering such a motion, the court accepts the factual allegations alleged in the complaint

as true and draws all inferences in the plaintiff's favor.") (internal citations omitted).  But "[a]

court considering a motion to dismiss may begin by identifying allegations that, because they are

mere conclusions, are not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662,

664 (2009).  In deciding a Rule 12(b)(1) motion, courts may also refer to evidence outside the

pleadings.  *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145, 146 (2d Cir. 2011) (per

curiam).

"Notably, dismissals for lack of standing are without prejudice, while dismissals for

failure to state a claim are adjudications on the merits with preclusive effect."  *Weldon v. MTAG

Servs., LLC*, 2017 WL 776648, at *4 (D. Conn. Feb. 28, 2017) (cleaned up).  "[W]here there is a

lack of Article III standing, Article III deprives federal courts of the power to dismiss a case with

prejudice."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016).

B. <u>Federal Rule of Civil Procedure 12(b)(6)</u>

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to

assay the weight of evidence which might be offered in support thereof." *Ryder Energy*

*Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)

(quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the

material facts alleged in the complaint as true, draw all reasonable inferences in favor of the

plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007);

*Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the

speculative level," and assert a cause of action with enough heft to show entitlement to relief and

"enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also*

*Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they

must be supported by factual allegations.").  The plausibility standard set forth in *Twombly* and

*Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more

than "labels and conclusions, and a formulaic recitation of the elements of a cause of action."

*Twombly*, 550 U.S. at 555 (internal quotation marks omitted).  Plausibility at the pleading stage

is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it

strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very

remote and unlikely." *Id*. at 556 (internal quotation marks omitted).

C. Construing *Pro Se* Pleadings

Clark proceeds *pro se*. Therefore, his pleadings are entitled to "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010); are assessed under "less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (cleaned up); and are interpreted "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (cleaned up). On the other hand, a court's "duty to liberally construe a plaintiff's complaint" is not "the equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (citation omitted). A court will not credit "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" nor "invent factual allegations" that are not in the pleadings. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (cleaned up).

## III. Discussion

A. Individual Capacity Defendants' Motion to Dismiss

The Individual Capacity Defendants assert several bases for dismissal: lack of standing; failure to state a claim under 42 U.S.C. § 1983; failure to state a claim under 42 U.S.C. § 1985; the intracorporate conspiracy doctrine; qualified immunity; and that the relief Clark seeks is not available.[6] Indiv. Defs.' Mot. to Dismiss, Doc. No. 17, at 1. I address each argument in turn.

1. *Standing*

As I construe the Complaint, Clark alleges that Defendants' conduct in terminating Mrs. Clark for his speech adversely affected his speech and caused him tangible harms, in violation of Clark's First Amendment rights under 42 U.S.C. § 1983. Both sets of Defendants characterize

---

[6] The Individual Capacity Defendants also include the Eleventh Amendment and sovereign immunity in their motion as reasons to dismiss the official capacity claims. I will address those arguments in the subsequent section regarding the Official Capacity Defendants' Motion to Dismiss.

Clark's allegations as attempting to "assert claims for alleged injuries to [Clark's] (unidentified) wife" and to "pursue[ ] the claims of a non-party." Indiv. Defs.' Mem. of Law, Doc. No. 17-1, at 8-9; *see also* Off. Defs.' Mem. of Law, Doc. No. 33-1, at 11 (arguing same). On that basis, both sets of defendants argue that Clark "has not alleged that he *personally* suffered any" injury and, therefore, that Clark lacks standing. Indiv. Defs.' Mem. of Law, Doc. No. 17-1, at 8. In my view, Defendants mischaracterize Clark's claims, and their conclusory analysis is contrary to precedent. Accordingly, I reject Defendants' invitation to dismiss the Complaint pursuant to Rule 12(b)(1) and deny the motions to dismiss for lack of standing.

It is well-settled that a private citizen can have standing to state a First Amendment retaliation claim. *E.g.*, *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). Although a plaintiff alleging First Amendment retaliation "typically" is "the same individual against whom the defendant took adverse action," that factual posture is not required. *Jones v. Bay Shore Union Free Sch. Dist.*, 947 F. Supp. 2d 270, 276 (E.D.N.Y. 2013). Indeed, the Second Circuit and courts within the Circuit have repeatedly recognized that a private citizen's First Amendment rights can be infringed by retaliatory actions carried out against a plaintiff's close kin. *See*, *e.g.*, *Adler v. Pataki*, 185 F.3d 35 (2d Cir. 1999) (holding that a public employee stated a First Amendment claim arising from his retaliatory discharge arising from his wife's lawsuit); *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 134 (D. Conn. 2010) (holding that a private citizen stated a First Amendment claim arising from discipline of her public employee husband in retaliation for her criticism of public officials); *Bay Shore Union Free Sch. Dist.*, 947 F. Supp. 2d at 276 (holding that a parent stated a First Amendment retaliation claim based, in part, on his child's expulsion from school allegedly in retaliation for his speech); *C.T. v. Valley Stream*

*Union Free Sch. Dist.*, 201 F. Supp. 3d 307, 317 (E.D.N.Y. 2016) (recognizing that parents' First Amendment retaliation claim arose from a school disciplining their child).

Defendants do not cite to it, but *Adler v. Pataki* is controlling on these facts. 185 F.3d 35 (2d Cir. 1999). There, the Second Circuit recognized that a spouse suffered an independent injury when he was retaliated against for his partner's protected conduct. *Id.* at 45. Specifically, a state employee alleged that he was terminated in retaliation for his wife's conduct in filing a discrimination lawsuit against the state. *Id.* at 38. The Second Circuit concluded that "a retaliatory discharge based solely on" the spouse's protected speech "is actionable under the First Amendment." *Id.* at 45. Therein, Judge Newman reasoned as follows:

> [T]he activity of Adler's wife in suing state officials for herself and another plaintiff because of employment discrimination in her department could not reasonably be found to justify [Adler's] discharge. Wherever the line might be drawn that separates a state's permissible and impermissible actions against an employee based on a spouse's conduct, Adler's discharge because of his wife's lawsuit is well across the line. . . . If simple vindictiveness against the plaintiff on account of his wife's lawsuit was the defendants' true motive, a First Amendment violation would be established.

*Id.* at 44. Defendants' arguments, in effect, require that *Adler* merely established a "right of a government policy-maker to be free from adverse employment action in retaliation for . . . his wife's activities," without recognizing his wife's commensurate right to be free of such retaliation. *See id.* at 48. But both the Second Circuit itself and several courts within the Circuit have held that the right recognized by *Adler* is not so circumscribed. *See, e.g., Gorman v. Rensselaer Cnty.*, 910 F.3d 40, 47 (2d Cir. 2018) ("*Adler* . . . establishes that First Amendment associational rights protect against state intrusion into a family relationship intended to retaliate for a family member's exercise of his or her First Amendment rights."). In *Everitt v. DeMarco*, this Court recognized in a situation analogous to the instant one that a private citizen spouse of a public employee had standing to state First Amendment claims. 704 F. Supp. 2d 122, 134 (D.

11

Conn. 2010).  There, after police officer Bruce Everitt sustained injuries on the job, his private

citizen spouse Kathleen Everitt wrote critical letters to police commissioners.  *Id.* at 127.[7]

Thereafter, the department suspended Bruce Everitt in substantial part because Kathleen Everitt's

letters violated the employee grievance procedure.  *Id.* at 127-28.  This Court recognized that

Bruce and Kathleen each had standing to raise claims for First Amendment retaliation and

violation of their right of intimate association.  *Id.*  Other courts within the Circuit have likewise

applied *Adler*.  *See*, *e.g.*, *Jones*, 947 F. Supp. 2d at 276; *C.T.*, 201 F. Supp. 3d at 317 n.6.  Said

differently, courts acknowledge that the right recognized in *Adler* also applies to the non-

employee spouse, and there can be no question that Clark's right to be free from retaliation for

protected speech may be infringed by a retaliatory adverse action against his wife.

Moreover, even if precedent did not preclude Defendants' standing analysis, I would

reject their argument as a policy matter.  In this country, "few values are more carefully and

thoroughly protected than the citizen's right to speak his mind on matters of public concern

without interference by the government."  *Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir. 2002).

It is inconsonant with First Amendment freedoms that the state could lawfully punish a private

citizen for his protected speech by targeting his spouse, and that a citizen would be unable to

redress such violation.  A public employee's speech is reasonably subject to certain restrictions

intended to "respect the needs of government employers attempting to perform their important

public functions."  *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006).  On the other hand, a private

person's rights are defined and protected more capaciously.  *Cf. Waters v. Churchill*, 511 U.S.

661, 672 (1994) ("[T]hough a private person is perfectly free to uninhibitedly and robustly

---

[7] In *Everitt*, the parties disputed whether Kathleen Everitt intended to send the letters to the police commissioners.
After writing the letters, Kathleen had left them on the table.  Bruce later handed the letters to an intermediary, who
then delivered the letters to the commissioners.  For purposes of its legal analysis, this Court assumed that Kathleen
Everitt had intended to send the letters and that the letters were protected speech.  I do, too.

criticize a state governor's legislative program, we have never suggested that the Constitution

bars the governor from firing a high-ranking deputy for doing the same thing.").

    With those principles in mind, I turn to Defendants' conclusory standing analysis.  *See*

Indiv. Defs.' Mem. of Law, Doc. No. 17-1, at 8-9.  A plaintiff must satisfy three elements to

establish the constitutional minimum of standing: (1) an "injury in fact" which is both "concrete

and particularized" and "actual or imminent"; (2) causation; and (3) redressability.  *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In the Second Circuit, a plaintiff may plead

a First Amendment injury in fact by alleging either a "non-speech related" but "concrete" harm

related to his First Amendment rights, *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir.

2013) (per curiam), or an "actual, non-speculative chilling effect" on his exercise of First

Amendment rights, *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam).

    Here, Clark asserts that he experienced both kinds of injuries.  He alleges that he

criticized public officials and, as a result, Defendants caused him pecuniary harms (lost income,

retirement income, and healthcare coverage), emotional distress ("medical expenses due to

stress"), and chilled speech ("intimidation").  Compl., Doc. No. 1, at 5.  Clark declares that he

suffered the kinds of harms ordinarily constituting an injury in fact.  *Curley*, 268 F.3d at 73 (a

private citizen had standing based on chilled speech); *Phillips v. Bowen*, 278 F.3d 103, 111 (2d

Cir. 2002) (a private citizen had standing based on emotional distress).  Whether Clark

sufficiently alleges the merits of his claims is another matter, a matter which I prefer to address

in connection with Defendants' Rule 12(b)(6) arguments.  *See Arizona State Legislature v.*

*Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) ("one must not 'confus[e]

weakness on the merits with absence of Article III standing'") (quoting *Davis v. United States*,

564 U.S. 229, 249 n.10 (2011)); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) (standing

"often turns on the nature and source of the claim asserted," but it "in no way depends on the merits" of the claim).

Accordingly, I decline to characterize Clark's claims as derivative of Mrs. Clark's claims and, on that basis, to dismiss them for lack of standing. I deny Defendants' Motions to Dismiss pursuant to Rule 12(b)(1). Instead, I turn to the sufficiency of Clark's allegations under Rule 12(b)(6).

### 2. *First Amendment Retaliation, Arising Under 42 U.S.C. § 1983*

Even if Clark has standing, both sets of Defendants argue, he nevertheless fails to state a claim for First Amendment retaliation. Indiv. Defs.' Mem. of Law, Doc. No. 17-1, at 9-10; Off. Defs.' Mem. of Law, Doc. No. 33, at 2. I agree in part and disagree in part.

"To state a claim under section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his constitutional rights." *Colombo*, 310 F.3d at 117. Defendants invoke the elements of a public employee's claim for First Amendment retaliation, *see* doc. no. 17-1, at 8 (citing *Garcetti*, 547 U.S. at 418), but "the elements of a First Amendment retaliation claim . . . depend[ ] on the factual context," *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008). In this case, Clark is a private citizen. To state a claim for First Amendment retaliation, a private citizen must allege (1) that he has "an interest protected by the First Amendment"; (2) that the defendants' actions were "motivated or substantially caused by his exercise of that right"; and (3) that the defendants' action "adversely affected" his exercise of his First Amendment right or that he has suffered some other "concrete harm." *Curley*, 268 F.3d at 73; *Dorsett*, 732 F.3d at 160. Construing the pleadings liberally and drawing all inferences in Clark's favor, the Complaint successfully pleads all three elements.

14

a.   Clark Pleads a First Amendment Interest

Clark successfully pleads the first prong, an interest protected by the First Amendment, because his legislative testimony was protected speech.

A citizen's right to "petition the Government for a redress of grievances" is expressly protected by the First Amendment.  U.S. Const. Amend. I.  In addition, "[t]he right to criticize public officials is at the heart of the First Amendment's right of free speech." *Kaluczky v. City of White Plains*, 57 F.3d 202, 210 (2d Cir. 1995) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 282 (1964)).  "Citizens are encouraged to speak out on matters of public concern and are constitutionally protected when they exercise that right." *Id.* (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)).  Accordingly, advocating for specific legislation and criticizing a public official in testimony to a legislative committee is plainly protected by the First Amendment.  *See*, *e.g.*, *Lami v. Stahl*, 2007 WL 2221162, at *5 (D. Conn. July 31, 2007), *adhered to on reconsideration*, 2007 WL 3124834 (D. Conn. Oct. 25, 2007).  A private citizen's right to engage in these protected activities entails a right to be free from retaliation for doing so.

In addition to championing R.B. 5050, the Testimony was plainly critical of defendant Bucari, a public official.  Clark criticized that Bucari had a job, even though a significant portion of the First Assistant Commissioner's responsibilities were eliminated by the succession tax repeal; that Bucari's "shortcomings" had resulted in litigation losses; and that the state had shelled out money to settle administrative complaints in connection with Bucari's alleged misconduct.  Clark championed that any attempt to "protect" Bucari should instead result in Bucari's joblessness.  The Testimony, declaring Clark's support for R.B. 5050 and overtly criticizing Bucari, was well-within the heartland of a First Amendment interest.

On the other hand, a FOI request is not necessarily a protected activity.  *Milardo v. City of Middletown*, 528 F. Supp. 2d 41, 45 (D. Conn. 2007) ("there is no First Amendment right to

15

access government information, even by way of the FOIA"); *see also Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978) (plurality opinion) ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control."); *but see McAvey v. Orange-Ulster BOCES*, 805 F. Supp. 2d 30, 40 (S.D.N.Y. 2011) (holding that a citizen's FOI request was protected speech).

Accordingly, to the extent that Clark raises a First Amendment retaliation claim in connection with his FOI request, such claim is dismissed with prejudice.

b.   Clark Pleads a First Amendment Injury[8]

Clark, alleging pecuniary harm and emotional distress, also pleads a First Amendment injury.

A plaintiff can establish an injury by showing that the defendants' actions "effectively chilled the exercise of his First Amendment right." *Curley*, 268 F.3d at 73.  Clark asserts that he experienced "First Amendment intimidation," which I construe to allege chilling.  Compl., Doc. No. 1, at 5; Opp'n, Doc. No. 27, at 3.  However, Clark does not allege that Mrs. Clark's termination (the alleged intimidation) actually chilled his speech.  The Compliant includes no allegations after Mrs. Clark's termination. Therefore, there is no showing that Clark's speech was adversely affected by Defendants' conduct.  Where a plaintiff shows no change in his behavior, as here, "he has quite plainly shown no chilling of his First Amendment right to free speech." *Curley*, 268 F. 3d at 73.  A plaintiff's "naked assertion of a chill" is insufficient to "defeat a Rule 12(b)(6) motion." *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992).

---

[8] I address the second factor (causation) after the third factor (injury) because there can be no causation without an injury.

Accordingly, Clark's conclusory claim of "intimidation" does not establish a First Amendment injury.

That said, "[c]hilled speech is not the *sine qua non* of a First Amendment claim." *Dorsett*, 732 F.3d at 160. A plaintiff may instead establish an injury based on some other "concrete" harm. Clark adequately pleads concrete harm.

First, Clark alleges lost income and healthcare coverage. Compl., Doc. No. 1, at 4. Such losses have, no doubt, caused him a "concrete diminution in . . . [his] security" and pecuniary harm. *Gill v. Pidlypchak*, 389 F.3d 379, 383 (2d Cir. 2004); *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 432 (S.D.N.Y. 2013) (pecuniary harm). This Court has recognized the pecuniary harm arising from a spouse's lost income. *See Everitt,* 704 F. Supp. 2d at 134 (recognizing that the termination of one spouse caused the couple economic harm, "because they file a joint tax return and therefore any economic injury inflicted on one spouse affects them equally"); *accord Int'l Assoc. of Firefighters of St. Louis v. City of Ferguson*, 283 F.3d 969, 973 (8th Cir. 2002) ("if [the plaintiff's] husband were disciplined or lost his job," in retaliation for the plaintiff's protected speech, "the economic adverse effect on her would be clear, especially, perhaps, in view of the fact that they have a joint bank account").

Second, Clark alleges that he experienced stress and increased stress-related medical expenses. "It is a basic principle of . . . civil rights law . . . that compensable injuries may include not only monetary losses such as out-of-pocket expenses but also injuries such as . . . 'mental anguish.'" *Henry v. Gross*, 803 F.2d 757, 768 (2d Cir. 1986); *see also Bernheim v. Litt*, 79 F.3d 318, 325-26 (2d Cir. 1996) (applying *Henry* to a First Amendment retaliation claim); *Dingwell v. Cossette*, 327 F. Supp. 3d 462, 472 (D. Conn. 2018) (same).

Accordingly, Clark sufficiently alleges First Amendment injuries.

c.   Clark Pleads a Causal Nexus

It is a close call whether the Complaint sufficiently alleges that Defendants' retaliatory conduct was caused by Clark's legislative testimony, but I think Clark sufficiently pleads a causal nexus for his claim to survive at this stage of the litigation.

To "state[ ] a plausible claim for relief," a plaintiff must allege facts sufficient to support more than a "mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. Accordingly, courts dismiss retaliation claims stated in wholly conclusory terms. *E.g.*, *Nolen v. City of Barre, Vt.*, 2011 WL 805865, at *9 (D. Vt. 2011) (citing *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987)). At the same time, the "ultimate question of retaliation" is difficult to plead with specificity, because it requires a showing of the defendants' "motive[s] and intent." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994).

As Defendants amply point out, the anemic Complaint has defects. Most obviously, the Complaint does not allege that Defendants were present during Clark's testimony, nor include any other express allegation from which I may conclude they were made aware of it. In addition, the Complaint does not expressly allege that Defendants were aware of Clark's marital relationship with Mrs. Clark, nor provide any other basis by which Defendants may have connected Clark to his wife. The text of the Testimony cures neither defect. On similar facts, the Second Circuit has concluded that an absence of such allegations is fatal. *See Sharpe v. City of New York*, 560 F. App'x 78, 80 (2d Cir. 2014) (finding plaintiff's statements that defendants knew about his father's political candidate "wholly conclusory" where, *inter alia*, "[n]ot once in his complaint [did the plaintiff] contend that he ever disclosed his father's political candidacy").

On the other hand, Clark alleges that Biello "gave evidence" through the FOI process "that [Clark's] protected speech and action were part of the reason for the firing of [his] wife." Compl., Doc. No. 1, at 4. Clark does not flesh out that claim. In this context, the term evidence

18

could be construed as either a factual allegation or a legal conclusion.  In light of Clark's *pro se*

status, and because the plain meaning of the term evidence is "something that furnishes proof," I

liberally construe the term as an assertion of fact rather than a legal conclusion.  *Evidence,*

Merriam Webster, https://www.merriam-webster.com/dictionary/evidence (last visited

September 29, 2022).  Accordingly, I treat as true, for the purpose of evaluating the motions to

dismiss, the statement that Clark had documentary evidence that Biello terminated Mrs. Clark (at

least in part) because of the Testimony.  Thus, admittedly with some hesitation, I infer that

Defendants were aware of Clark's testimony and his marriage to Mrs. Clark.

Assuming that Defendants were aware of Clark's testimony and marital relationship, the

issue then becomes whether the Complaint alleges sufficient evidence of retaliatory intent.  A

plaintiff may demonstrate intent directly or indirectly, through allegations "from which a

retaliatory intent on the part of the defendants reasonably may be inferred."  *Gagliardi*, 18 F.3d

at 195.  Apart from the vague assertion that Biello "gave evidence" that his testimony provoked

Mrs. Clark's termination, the Complaint does not allege direct evidence.  Instead, the Complaint

seems to principally rely on circumstantial evidence.

First, the Complaint suggests that the chain of events— Clark testified, then his wife was

fired— speaks for itself.  In this Circuit, a plaintiff may demonstrate a causal relationship "by

means of circumstantial evidence, including that the protected speech was followed by adverse

treatment. . . ."  *Wrobel v. Cty. of Erie*, 692 F.3d 22, 32 (2d Cir. 2012).  Accordingly, the

sequence of events lends support for Clark's retaliation claim.

Second, Clark seems to imply that the temporal proximity between the protected speech

and the adverse action against Mrs. Clark supports his retaliation claim.  Defendants disagree,

suggesting that the testimony and termination were too attenuated.  *See* Doc. No. 17-1, at 19

("[s]imply because Plaintiff alleges that his testimony eight months prior to his wife's dismissal motivated the Defendants is not enough to defeat qualified immunity").  It is a close call, but I believe that Clark plausibly pleads a temporal nexus.

A plaintiff can establish a causal connection suggesting retaliation through "showing that protected activity was close in time to the adverse action."  *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citation omitted); *Dingwell v. Cossette*, 327 F. Supp. 3d 462, 472 (D. Conn. 2018).  If the claim "mere[ly]" relies on temporal proximity for "sufficient evidence of causality," the temporal proximity must be "very close."  *Espinal*, 558 F.3d at 129 (citing *Clark Ct. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).  At the same time, there is "no bright-line rule as to what constitutes 'very close,'" and the Second Circuit has repeatedly "declined to 'nail down the elusive outer limit.'"  *Clayton v. City of Middletown*, 564 F. Supp. 2d 105, 112-113 (D. Conn. 2008) (quoting *Gorman–Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554–55 (2d Cir. 2001)); *see also Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.,* 444 F.3d 158, 168 (2d Cir. 2006).  The inquiry is fact-dependent.

Clark alleges that after his February 21, 2020 testimony, Defendants terminated his wife "in retribution" on October 13, 2020.  Compl., Doc. No. 1, at 4.  Therefore, nearly eight months passed between the protected conduct and the allegedly retaliatory act.  This period is lengthy, but it is not dispositive; the Second Circuit has determined that similarly long periods give rise to an inference of causation.  *See, e.g.*, *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight months between EEOC complaint and alleged retaliation); *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (seven months between filing of lawsuit and alleged retaliation); *Espinal*, 558 F.3d at 129 (six months between dismissal of lawsuit and alleged retaliation); *Gorman–Bakos*, 252 F.3d at 555 (five months between criticism of public officials

and alleged retaliation); *but see Brown v. City of New York*, 622 F. App'x 19, 20 (2d Cir. 2015)

(summary order) ("when no other basis to infer retaliation is alleged," the "passage of even two

or three months" undermines causation) (citations omitted).

That said, it is plausible that the alleged retaliation began earlier than Clark alleges.

Clark only includes the date when Mrs. Clark was terminated, but it is likely that she was placed

on leave and investigated at an earlier time.[9]  As set forth in state regulation, state employees are

entitled to substantial due process prior to termination.  Regs., Conn. State Agencies §  5-240-5a

(outlining the procedures for dismissal of a state employee); *see also Board of Regents of State*

*Colleges v. Roth*, 408 U.S. 564 (1972); *Cleveland Board of Education v. Loudermill*, 470 U.S.

532, 546 (1985).  Indeed, such procedures could plausibly last the nearly eight months alleged

here.  *E.g.*, *Watts v. Employee's Review Bd.*, 2008 WL 3852687, at *3 (Conn. Super. Ct. July 17,

2008) (eight months between placement on leave pending investigation and date of termination).

Accordingly, I may reasonably infer that Defendants initiated the termination process earlier than

Mrs. Clark's termination date, suggesting that the temporal nexus between the protected speech

and retaliation is shorter than is expressly alleged in the complaint.

Moreover, in cases implicating lengthy intervening periods, the Second Circuit has

heavily weighted facts suggesting that the defendants waited for an "opportune time" to retaliate.

*Summa,* 708 F.3d at 128.  In this case, although the Complaint does not allege that Mrs. Clark

was terminated at an opportune time, it is reasonable to infer that she had been placed on leave

pending investigation and was terminated at the conclusion of such investigation.  In other

---

[9] Although I do not rely on Defendants' briefing in drawing this inference, Defendants too suggest that Mrs. Clark was a "classified managerial and confidential employee[]" entitled to civil service protections, "presum[e that] [Mrs. Clark's] conduct was investigated," and "presume [the] involve[ment]" of the State of Connecticut Office of Labor Relations in her termination process.  *See* Doc. No. 17-1, at 18-19.  In other words, they draw similar inferences from the Complaint suggesting that the alleged retaliation began earlier than the complaint states.

words, it is plausible that eight months later was the earliest available time that Biello could have terminated Mrs. Clark. *See Summa*, 708 F.3d at 128 (reasoning that a temporal nexus was closer than expressly alleged when "the adverse action occurred at the first actual opportunity to retaliate").

To the extent that Defendants seem to imply that Mrs. Clark's termination was based on her "potential wrongdoing at work," and that it is "not the role of the Court to review or second guess the fairness or merit of Defendant's personnel and business decisions," Doc. No. 17-1, at 19 (quoting *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, 2006 WL 2642415, at *18 (D. Conn. Sept. 13, 2006)), Defendants rely on information outside of the Complaint that may not be considered on a motion to dismiss. Furthermore, Defendants' arguments suggest that there are unresolved factual issues that cannot be determined from the allegations or the Testimony alone. Accordingly, Defendants' arguments militate against dismissal at the pleadings stage.

In my view, Clark sufficiently alleges the elements of a First Amendment retaliation claim. Accordingly, I must assess the potential liability of each Individual Defendant. *Iqbal*, 556 U.S. at 676.

### d.   Clark Has Only Pleaded Biello's Individual Liability

To establish individual liability under Section 1983, a plaintiff must show that a particular defendant "is a 'person' acting 'under the color of state law,'" and that the defendant "caused the plaintiff to be deprived of a federal right." *Back v. Hastings on Hudson Union Free Sch. Dist*., 365 F.3d 107, 122 (2d Cir. 2004) (citation omitted). In this case, the Individual Capacity Defendants indisputably acted under color of state law, so the only issue is whether each defendant was personally involved in the alleged deprivation. In the context of a First Amendment retaliation claim, "the question of the personal involvement . . . will merge with the

question of whether the adverse actions [the p]laintiff alleges they took plausibly state a retaliation claim." *A.S. v. City Sch. Dist. of Albany*, 2022 WL 356697, at *16 (N.D.N.Y. Feb. 7, 2022).

At the pleadings stage, construing all inferences favorably towards Clark and reading the Complaint in tandem with the Testimony, the Complaint sufficiently alleges Biello's liability. The Complaint alleges that Biello "fired" Mrs. Clark, committing the adverse act at the heart of this litigation.  Compl., Doc. No. 1, at 4.  Moreover, Clark alleges that Biello, in a communication between Biello and Bucari subject to Clark's FOI request, "gave evidence that [Clark's] protected speech and action were part of the reason for the firing of [his] wife." *Id.*

On the other hand, Clark's assertion that Bucari "conspired" with Biello to terminate Mrs. Clark is an unsupported legal conclusion, not a factual allegation that the Court must accept as true at this stage of the proceeding.  *Id.*  The Testimony targeted Bucari personally and advocated for Bucari's termination; therefore, it is at least plausible that Bucari had a motive to retaliate against Clark.  But Clark only alleges that Biello fired his wife and does not provide sufficient allegations supporting Bucari's involvement.  Therefore, he does not allege a plausible basis for Bucari's liability.

Accordingly, I deny the Individual Capacity Defendants' motion to dismiss Clark's First Amendment retaliation claim against Biello.  On the other hand, I grant the Individual Capacity Defendants' motion to dismiss Clark's First Amendment retaliation claim against Bucari, without prejudice.

3. *Infringement of the Right of Intimate Association, Arising Under 42 U.S.C. § 1983*

Clark does not claim infringement of his right to intimate association, but I construe that Clark asserts an intimate association claim under *Adler* and *sua sponte* assess it under Rule 12(b)(6).

The Complaint plainly implicates Clark's right of intimate association, because it alleges a protected relationship and interference with the relationship. The Supreme Court has recognized that the right of association protects the right to "enter into and maintain certain intimate human relationships," expressly including marriage. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). On that basis, the Second Circuit has held that a public employee's retaliatory discharge in response to litigation brought by the employee's spouse gives rise to an actionable intimate association claim.[10] *Adler*, 185 F. 3d at 44. Applying *Adler*, this Court recognized in *Everitt* that the right to intimate association is infringed where a public employee is disciplined allegedly in retaliation for the protected speech of his private citizen spouse, and the discipline caused the couple to "fight more often," "creat[ed] a significant strain on their marriage," and caused the couple "economic injury." 704 F. Supp. 2d at 134.

Here, Clark asserts that his spouse was disciplined by Defendants in retaliation for his protected speech. Clark does not expressly plead that his marriage was strained, but he alleges sufficient factual allegations to plausibly state a claim. For one, he alleges personally experiencing stress and stress-related expenses. Compl., Doc. No. 1, at 5. And he pleads facts

---

[10] The *Adler* Court, though recognizing that the source of the intimate association right "ha[d] not been authoritatively determined, concluded that the allegedly retaliatory discharge was actionable under the First Amendment. *Adler*, 185 F. 3d at 42, 44. The Second Circuit has subsequently located the right to intimate association in both the First and Fourteenth Amendment. *Compare Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 996 (2d Cir. 1997) (Fourteenth), *with United States v. Thompson*, 896 F.3d 155, 164 (2d Cir. 2018) (First). Regardless of its source, the right is implicated on these facts.

that would plausibly strain any marriage, including lost income and benefits.  In my view, at this early stage and in light of Clark's *pro se* status, those factual allegations are sufficient.

To the extent that I must assess each Defendant's individual liability, the liability for the intimate association claim is predicated on the alleged retaliation.  Therefore, the analysis of individual liability for the intimate association claim is coextensive with the analysis for the alleged retaliation.  Accordingly, for the reasons set forth in the previous section, the intimate association claim may proceed against Biello in his individual capacity.  The intimate association claim against Bucari in his individual capacity is dismissed without prejudice.

### 4.  *Conspiracy to Deprive First Amendment Rights*

Clark next asserts that Biello conspired with Bucari to fire his wife from her job.  Compl., Doc. No. 1, at 4.  I assess the claim for conspiracy under both 42 U.S.C. § 1983 and, as Clark asserts, 42 U.S.C. § 1985.  Ultimately, I agree with Defendants that Clark fails to state a claim for conspiracy.

### a.  Conspiracy, Arising Under 42 U.S.C. § 1983

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  Although "conclusory allegations of a § 1983 conspiracy are insufficient," conspiracies are "secretive operations" that "may have to be proven by circumstantial, rather than direct, evidence."  *Id.*  A plaintiff must show "some factual basis supporting a meeting of the minds, such that the defendants entered into an agreement, express or tacit, to achieve the unlawful end."  *Aho v. Anthony*, 782 F. Supp. 2d 4, 7 (D. Conn. 2011).

Clark's section 1983 conspiracy claim fails on the first prong, the existence of a
conspiracy.  The Complaint asserts a legal conclusion that there was a conspiracy to fire his wife,
but it does not allege sufficient facts giving rise to an inference of a meeting of the minds.  The
Complaint alleges that Biello terminated her employment, but it does not draw a clear connection
between Biello's conduct in terminating Mrs. Clark and Bucari's potential motive.  Merely
stating that the defendants conspired does not, without more, state a claim for conspiracy.  *See
Robbins v. Cloutier*, 121 F. App'x 423, 425 (2d Cir. 2005).  "[C]onclusory, vague or general
allegations of conspiracy," like the ones offered here, are not enough.  *Ciambriello v. County of
Nassau*, 292 F.3d 307, 325 (2d Cir. 2002).

Accordingly, I grant Defendants' motion to dismiss Clark's section 1983 conspiracy
claim without prejudice.

### b.   Conspiracy, Arising Under 42 U.S.C. § 1985

Clark also asserts that Defendants Biello and Bucari conspired to deprive him of his First
Amendment rights pursuant to 42 U.S.C. § 1985(3).  Compl., Doc. No. 1, at 3.  Clark also fails to
state a conspiracy claim arising under section 1985.

Section 1985(3) makes unlawful a conspiracy to "depriv[e] any person or any class of
persons of the equal protection of the laws" or use "force, intimidation, or threat to prevent any
citizen of the United States lawfully entitled to vote from giving his support or advocacy" to a
political candidate for a federal office.  42 U.S.C. § 1985(3).  To state a conspiracy claim under
42 U.S.C. § 1985(3), a plaintiff must show: "(1) a conspiracy; (2) for the purpose of depriving,
either directly or indirectly, any person or class of persons of the equal protection of the laws, or
of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4)
whereby a person is either injured in his person or property or deprived of any right or privilege

of a citizen of the United States."  *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d

Cir. 2007) (cleaned up).

For the same reasons explained above, Clark's section 1985(3) claim fails on the first

prong.  *See Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (cleaned up) (setting forth the same

"meeting of the minds" requirement under section 1985).

In addition, Clark's section 1985(3) claim fails on the second prong.  The Second Circuit

has held that a section 1985 conspiracy must be motivated by "some racial or perhaps otherwise

class-based, invidious discriminatory animus," of which there is no evidence here.  *Cine SK8,*

*Inc.*, 507 F.3d at 791 (cleaned up).  Clark alleges retaliation for exercise of his First Amendment

rights, but nothing in the Complaint nor the Testimony suggests any connection with race or any

other protected class.[11]  Section 1985(3) was "not intended to provide a federal remedy for 'all

tortious, conspiratorial interferences with the rights of others' and was specifically limited 'by

requiring, as an element of the cause of action, . . . invidiously discriminatory motivation.'"

*Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015).

Without any evidence of invidiously discriminatory motivation, repleading would be

futile and Clark cannot state a section 1985(3) claim.  Accordingly, I grant Defendants' motion

to dismiss the section 1985 claim with prejudice.

---

[11] Because the protected activity at issue was Clark's legislative testimony, it bears mentioning that political affiliation is not a recognized protected class.  *See Gleason v. McBride*, 869 F.2d 688, 694-95 (2d Cir. 1989) ("those who are in political and philosophical opposition to [the defendants], and who are, in addition, outspoken in their criticism of the [defendants'] political and governmental attitudes and activities do not constitute a cognizable class under section 1985") (internal citation omitted); *Turner v. Boyle*, 116 F. Supp. 3d 58, 95 (D. Conn. 2015) (". . . nor do [individuals] receive protected status [pursuant to section 1985] based on an allegation of discrimination on the basis of one's political views.").

c.   Intercorporate Conspiracy Doctrine Defense

Defendants assert that a conspiracy claim is barred by the intercorporate conspiracy

doctrine, which generally provides that "there is no conspiracy if the conspiratorial conduct

challenged is essentially a single act by a single corporation, acting exclusively through its own

directors, officers, and employees, each acting within the scope of his employment."  *Hermann*

*v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978).  Because I have dismissed the conspiracy claims

arising under sections 1983 and 1985, there is no surviving conspiracy claim.  Accordingly, I

need not— and do not— reach the Defendants' intercorporate conspiracy doctrine argument.

5.   *Qualified Immunity*

With respect to Clark's claims against the Individual Capacity Defendants for First

Amendment retaliation and interference with intimate association, I must determine whether the

surviving claims against Biello are barred by qualified immunity.  The Individual Capacity

Defendants argue that they are entitled to qualified immunity because it was "not clearly

established that terminating the employment of the Plaintiff's (unidentified) wife could be a

violation of the Plaintiff's rights" and "no reasonable person could believe any of [the

Defendants] even exceeded the bounds of their authority, let alone that they knowingly violated

clearly established law."  Indiv. Defs.' Mem. of Law, Doc. No. 17-1, at 15, 21 (emphasis

omitted).  I disagree.

Qualified immunity "protects government officials 'from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A governmental official is entitled to

qualified immunity either where (1) his conduct did not violate a constitutional right or (2) the

right at issue was not "clearly established" at the time of the alleged misconduct.  *Callahan*, 555 U.S. at 232.  District courts have the discretion to choose which of the two prongs of the qualified immunity standard to decide first, in view of the particular circumstances of the case at hand.  *See id*. at 236.

To prevail on qualified immunity grounds in a motion to dismiss, the defendants face a "formidable hurdle" and bear the burden of proof.  *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004).  The "facts supporting the defense [must] appear on the face of the complaint," and the plaintiff "is entitled to all reasonable inferences from the facts alleged . . . that defeat the immunity defense." *Id.*  at 436.

     a.   Clark's Rights to Advocate for Legislation, Criticize Public Officials, and Associate with Mrs. Clark Are Protected by the First Amendment and Clearly-Established Supreme Court and Second Circuit Law

The First Amendment, as incorporated against the States, provides that the government may not "abridge the freedom of speech" nor "the right of the people peaceably to assemble, and to petition the government for a redress of grievances."  U.S. Const. Amend. I.  Moreover, the activities for which Clark alleges his rights were infringed— advocating for legislation, criticizing public officials, and intimately associating with his wife— are plainly protected by the First Amendment, as explicated by clearly-established law.

For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  To determine whether a right was clearly established, the Court considers "(1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law

29

a reasonable defendant official would have understood that his or her acts were unlawful." *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 532 (2d Cir. 1993) (cleaned up) (quoting *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)).  Because a "reasonably competent public official should know the law governing his conduct," qualified immunity "ordinarily should fail" in cases where "the law was clearly established." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982).

First, Clark's rights to advocate for legislative proposals, and to be free from retaliation for doing so, have long been protected by the First Amendment.  It is almost axiomatic that "[t]hose who won our independence believed . . . that public discussion is a political duty; and that this should be a fundamental principle of the American government . . . [and] they amended the Constitution so that free speech and assembly should be guaranteed." *Whitney v. California*, 274 U.S. 357, 375-76 (1927) (cleaned up); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269-70 (1964) (describing "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"); *Bridges v. California*, 314 U.S. 252, 270 (1941) (setting forth the "prized American privilege to speak one's mind, though not always with perfect good taste, on all public institutions").

Second, Clark's rights to criticize a public official, and to be free from retaliation for doing so, have long been protected by the First Amendment.  *E.g.*, *Huminski v. Corsones*, 396 F.3d 53, 73 (2d Cir. 2005) (recognizing a right to criticize a public official); *Kaluczky*, 57 F.3d at 210 (same).  Indeed, the Supreme Court has long recognized a citizen's right to criticize a public official in general and a citizen's right to do so before a legislative committee in particular.  *E.g.*, *Perry v. Sindermann*, 408 U.S. 593, 598 (1972) (holding that critical legislative committee testimony is a protected First Amendment activity).

Moreover, it was clearly established at all relevant times that retaliation against constitutionally-protected expression is an infringement of a person's First Amendment right. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."). It was also clearly-established that retaliation against constitutionally-protected expression that causes pecuniary harm is an infringement of a person's First Amendment right. *See*, *e.g.*, *Sindermann*, 408 U.S. at 597-98 (collecting cases establishing that it is unconstitutional for the government to deprive a person in retaliation for exercising their First Amendment rights, even if the deprivation is to a mere benefit, because such a denial would unlawfully "interfere[] with constitutional rights").

Third, Clark's rights to intimately associate with his wife, and intimately associate with her free of undue state interference in particular, are also protected by the First Amendment. *See Roberts*, 468 U.S. at 619. Importantly, Mrs. Clark's status as a public employee did not impede that right, because a public employee also has a right to association "protected by the First Amendment from retaliation." *Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 465 (1979) (per curiam).

>   b.   Biello Had "Fair Warning" That Terminating Mrs. Clark in Retaliation for Clark's Protected Conduct Violated Clark's Constitutionally-Protected Rights

Defendants argue that they are entitled to qualified immunity because it was "not clearly established that terminating [Clark's] wife could be a violation of [Clark's] rights." Indiv. Defs.' Mem. of Law, Doc. No. 17-1, at 15. In other words, the Individual Capacity Defendants essentially argue that they are entitled to qualified immunity unless the specific *form* of retaliation has been held to be unlawful. That is not the law.

31

The requirement that a constitutional right be clearly established "does not mean that there must be a factual equivalency between the case at issue and prior cases." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014). "The 'salient question' instead is whether the case law at the time in question would have put reasonable [officials] on 'fair warning' that their conduct violated the plaintiff's rights." *Id.* (quoting *Pelzer*, 536 U.S. at 741). As a result, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Pelzer*, 536 U.S. at 741.

It has long been clearly established that it is unlawful to retaliate against a person for the exercise of First Amendment rights. That caselaw defeats qualified immunity for a defendant who retaliates against another for speaking out, and a defendant who dreams up a creative form of retaliation does not somehow reinstate entitlement to qualified immunity simply because the Second Circuit has never condemned that precise form of retaliation. Therefore, if Biello indeed terminated Mrs. Clark in retaliation for Clark's exercise of his First Amendment rights, Biello had fair warning that doing so violated the First Amendment.

In any event, it *was* clearly-established that retaliating against an individual's spouse for that individual's protected speech violates the First Amendment. In *Adler*, the Second Circuit recognized that a retaliatory dismissal of one spouse for the other's spouse's protected speech both infringes upon free speech and unduly interferes with an intimate relationship. 185 F. 3d at 44. For one, *Adler* holds that "[w]herever the line might be drawn that separates a state's permissible and impermissible actions against an employee based on a spouse's conduct, [a spouse's] discharge because of his wife's lawsuit is well across the line," and that "[i]f simple vindictiveness against the plaintiff . . . was the defendants' true motive, a First Amendment violation would be established." *Id.* at 35. In addition, *Adler* provides that "[i]f the First

Amendment accords an individual some right to maintain an intimate marital relationship free of undue state interference," then a husband's claim arising from retaliation for his wife's protected speech "properly invokes" the First Amendment, because the claim was "grounded on the most intimate of relationships, marriage, and warrants an appropriately high degree of protection." *Id.* at 44.   Therefore, it has been clear since *Adler* was decided in 1999 that terminating a public employee (Mrs. Clark) in retaliation for her spouse's protected speech (the Testimony) is a constitutional violation in the Second Circuit.[12]

As a matter of law, I impute knowledge of *Adler* to Biello.  Government officials "are charged with knowledge of relevant decisional law, especially the decisions of the circuit in which they perform their official duties." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989). Regarding of whether Clark or Mrs. Clark brought suit, Biello cannot credibly argue that he could not have known that the act of terminating Mrs. Clark in retaliation for Clark's protected conduct was not unlawful.  Biello is held have understood that the allegedly retaliatory termination violated Clark's rights.  *Anderson*, 483 U.S. at 640.

Accordingly, I decline to dismiss the First Amendment retaliation claim on qualified immunity grounds.

B.  <u>Official Capacity Defendants' Motion to Dismiss</u>

Clark brings claims pursuant to 42 U.S.C. §§ 1983 and 1985 against Boughton, Biello and Bucari in their official capacities.  The Official Capacity Defendants move to dismiss those

---

[12]Although a district court cannot define "clearly established law" for purposes of qualified immunity, *see McGowan v. United States*, 825 F.3d 118, 125 (2d Cir. 2016), the fact that courts within the Second Circuit have consistently applied *Adler* to protect covered First Amendment activities from retaliation against the citizen's kind further undermines the credibility of Defendants' argument.  *See, e.g.*, *Everitt*, 704 F. Supp. 2d at 138 (applying *Adler* in a denial of qualified immunity on facts squarely analogous to the instant matter); *Jones*, 947 F. Supp. 2d at 282 (denying qualified immunity on a motion to dismiss a parents' First Amendment claim arising from alleged retaliatory conduct towards their child).

claims because: Clark lacks standing, the Eleventh Amendment and sovereign immunity bar the claims for damages and injunctive relief against the Official Capacity Defendants, the intracorporate conspiracy doctrine, Clark fails to state a claim under Sections 1983 or 1985, and because the relief sought by Clark is not available.  Off. Capacity Defs.' Mot. to Dismiss, Doc. No. 33.  I address the necessary issues.

For the reasons set forth in the section regarding the Individual Capacity Defendants' motion to dismiss, I deny the Official Capacity Defendants' motion to dismiss on standing grounds pursuant to Rule 12(b)(1) and proceed to the Official Capacity Defendants' next argument, that the Eleventh Amendment and sovereign immunity bar Clark's claims.

1.  *Eleventh Amendment and Sovereign Immunity*

a.  The Eleventh Amendment Bars Clark's Claims Against the Official Capacity Defendants for Monetary Damages

The Eleventh Amendment to the United States Constitution bars a suit in federal court against a state or one of its agencies absent the state's explicit consent to suit or Congress's explicit abrogation of state immunity.  *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 99-100 (1984); *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 193 (2d Cir. 2015).  Here, the state has not consented to the suit, and Section 1983 does not override the state's Eleventh Amendment immunity.  *Quern v. Jordan*, 440 U.S. 332, 342 (1979).  As a result, the Eleventh Amendment protects the state officials from Clark's lawsuit for money damages in their official capacities.  *Kentucky v. Graham*, 473 U.S. 159 (1985). Accordingly, any official capacity claims for damages are barred by the Eleventh Amendment and must be dismissed with prejudice.  *See Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974).

      b.   Sovereign Immunity Bars Clark's Claims Against the Official Capacity
           Defendants for Injunctive Relief

The Eleventh Amendment, however, does not bar suits against state officials for

prospective injunctive relief.  *Ex Parte Young*, 209 U.S. 123, 155-59 (1908).  To determine

whether a plaintiff's claims fall within the scope of the *Ex Parte Young* exception, a court "need

only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation

of federal law and seeks relief properly characterized as prospective."  *Verizon Md. Inc. v. PSC*,

535 U.S. 635, 645 (2002) (cleaned up).  The exception, however, does not apply to claims

against state officials seeking injunctive relief for past violations.

Here, Clark's claims do not appear to fall within the scope of that exception.  He alleges

conduct that occurred in the past, and he seeks redress for the alleged past harms.  On that basis,

I cannot conclude that Clark seeks injunctive relief to remedy an on-going or future

constitutional violation.  Accordingly, I dismiss the official capacity claims for injunctive relief

with prejudice.

Taken together, I dismiss all claims against the Official Capacity Defendants.

## IV.    Conclusion

For the foregoing reasons, I **grant in part** and **deny in part** the Individual Capacity

Defendants' Motion to Dismiss,  Doc. No. [17].  The Individual Capacity Defendants' motions to

dismiss Clark's claims for lack of standing is **denied**.  To the extent that Clark's claims for First

Amendment retaliation and infringement of the right of intimate association arise from his

legislative testimony, the claims against Defendant Biello, in his individual capacity, **may**

**proceed**, and the claims against Defendant Bucari, in his individual capacity, are **dismissed**

**without prejudice**.  To the extent that the conspiracy claim arises under 42 U.S.C. § 1983, the

claim is **dismissed without prejudice**.  To the extent that the conspiracy claim arises under 42

U.S.C. § 1985, the claim is **dismissed with prejudice**.  Thus, all claims against Defendant Bucari, in his individual capacity, have been dismissed.

I **grant** the Official Capacity Defendants' motion to dismiss, Doc. No. [33], and I dismiss those claims **with prejudice**.  Thus, all claims asserted against Defendants Boughton, Biello, and Bucari, in their official capacities, are dismissed with prejudice.

Clark may file an amended complaint **within thirty days** of the date of this Order, on or before **November 2, 2022**.  The dismissals without prejudice will become dismissals with prejudice unless Clark files an amended complaint curing the noted pleading deficiencies.

So ordered.

Dated at Bridgeport, Connecticut, this 3rd day of October 2022.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge