# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

NATHANIEL CLARK,
    Plaintiff,

    v.

MARK BOUGHTON, et al.,
    Defendants.

No. 3:21-cv-1372 (SRU)

## ORDER ON MOTION FOR
## SUMMARY JUDGMENT

Plaintiff Nathaniel Clark ("Clark") brings a First Amendment civil rights action against two individuals employed by Connecticut's Department of Revenue Services (DRS). Clark presented legislative testimony highly critical of the DRS and its second-in-command. He alleges that two DRS employees retaliated against him by firing his wife, an attorney employed by the department. For the following reasons, I conclude that there is no genuine issue of material fact regarding Clark's failure to meet his prima facie burden on each of his claims. I therefore **grant** the defendants' motion for summary judgment, **doc. no. 117**.

## I.    Background

### A.  Factual History

Marilee Clark was the DRS's Tax Legal Director from 2015-2020. ERB Memo. of Decision, Doc. No. 117-10 at 94. Nathaniel Clark is Marilee Clark's husband.[1]

Marilee Clark reported to defendant John Biello, Acting Commissioner of the DRS. *Id.* Biello had been the Deputy Commissioner of the DRS, but became the temporary Acting Commissioner on January 17, 2020. *Id.* at 95; Biello Dep., Doc. No. 122-7 at 18-19. Defendant

---

[1] I refer to Nathaniel Clark as "Clark" and refer to Marilee Clark with her full name.

Louis Bucari, Jr. was the First Assistant Commissioner of the DRS. Biello Dep., Doc. No. 122-7 at 102. The First Assistant Commissioner is appointed by the DRS Commissioner and is a classified position. Conn. Gen. Stat. § 12-389(a); DRS Grievance Response, Doc. No. 117-10 at 50 n.30.

Marilee Clark had a contentious relationship with Bucari for almost her entire tenure at the DRS. For example, Marilee has said she once applied to be the DRS Commissioner so that she could fire Bucari. Brierley Memo, Doc. No. 117-10 at 46; *see id.* at 166-67 (submitting her application for Commissioner). She saved her emails with Bucari in a folder titled "Lucifer." Brierley Memo, Doc. No. 117-10 at 9. Marilee Clark has stated in meetings that she cannot and will not work with Bucari. *Id.* at 17; *see also* ERB Findings of Fact, Doc. No. 117-10 at 95 ¶ 7 ("Clark and . . . Bucari have a history of discord which has led to litigation in the past. Clark has stated she cannot work with him."). Marilee Clark and Bucari's negative relationship appears to stem from Marilee Clark's allegations that "she had been constructively demoted and subject to a hostile work environment as a result of Mr. Bucari's pursuit of an inappropriate relationship with another DRS employee." Superior Court Decision, Doc. No. 117-10 at 128.[2]

On February 3, 2020, Marilee Clark drafted legislation that would have repealed a state succession tax. Brierley Memo, Doc. No. 117-10 at 8. The proposed legislation would have moved the Frist Assistant Commissioner position from the DRS to the Office of the Attorney General and would have changed that position from classified to unclassified. DRS Response to Termination Grievance, Doc. No. 117-10 at 45-46. Bucari was the First Assistant

---

[2] It appears that Marilee Clark filed multiple complaints with the Connecticut Commission on Human Rights and Opportunities (CHRO) against Bucari and Biello. Biello Dep., Doc. No. 122-7 at 20, 96-97; Brierley Memo, Doc. No. 117-10 at 17. At oral argument on this motion, Clark objected to my use of testimony from CHRO proceedings. *See* Mot. Hr'g Tr., Doc. No. 137 at 13:02-16:13; *see also* Mot. for Sanctions, Doc. No. 134 at 2. That information is not before the Court. CHRO testimony, CHRO decision(s), and CHRO settlement(s) played no role in my consideration of this motion.

Commissioner, and had been for many years.  Biello Dep., Doc. No. 122-7 at 102.  The proposed legislation would have made Bucari replaceable by the Attorney General and would have taken away the DRS's ability to litigate its own cases before the state tax court.  DRS Response to Termination Grievance, Doc. No. 117-10 at 43.

Marilee Clark drafted the legislation on her work computer and emailed it to a lobbyist via her personal email.  Brierley Memo, Doc. No. 117-10 at 8.  Marilee Clark did not inform the lobbyist that she had drafted the legislation on behalf of herself personally, rather than in her capacity as the DRS's Tax Legal Director.  *Id.*  When the lobbyist forwarded the language to the Judiciary Committee, he told the Committee that it was DRS's proposed language.  *Id.* at 12-13, 33.  Marilee Clark, copied on the same email chain, did not correct the lobbyist.  *Id.*  Marilee Clark took the above actions without notifying defendant Biello.  *Id.* at 35.

On February 7, 2020, Biello verbally stated during a meeting that any legislative proposals from DRS regarding the succession tax had to be approved by him.  Superior Court Decision, Doc. No. 117-10 at 131.  Two days later, Biello emailed Marilee Clark and other DRS employees that any discussions about the succession tax must go through him.  *Id.*  Marilee Clark did not respond to that email.  *Id.*

When Biello became aware of Marilee Clark's proposed legislation, he contacted Aimee Plourde of the Human Resources department.  *See* Plourde Dep., Doc. No. 122-9 at 5.  Biello told Plourde that he had reason to believe Susan Sherman and Marilee Clark were behind the legislation.  *See id.*  Sherman was another DRS employee.  *See id.*  After consulting with the Office of Labor Relations (OLR), Plourde placed Sherman and Marilee Clark on administrative leave pending a misconduct investigation.  *Id.*[3]

---

[3] Biello had no "control over" the OLR when he was Acting Commissioner or Deputy Commissioner.  Doc. No. 122-7 at 94.

Normally, the DRS investigates employee misconduct internally.  Biello ERB Testimony, Doc. No. 122-14 at 6.  But Biello assigned Marilee Clark's misconduct investigation to an independent and external investigator, Kristen Brierley.  Biello Dep., Doc. No. 122-7 at 53-54.

Brierley commenced the investigation on February 19, 2020.  Brierley Memo, Doc. No. 117-10 at 8.[4]  Two days later, on February 21, 2020, Nathaniel Clark testified at a state legislative hearing.  *Id.* at 16.  He testified in support of Marilee Clark's proposed succession tax legislation.  Clark Testimony, Doc. No. 122-15 at 9.  Clark's testimony was critical of defendant Louis Bucari:  "I would strongly object to any attempts by the unappointed Acting Commissioner of DRS to change this language to protect an individual.  Especially an individual as problematic as . . . Louis Bucari. . . . The idea that section 5 might be changed to protect this individual is galling."  *Id.*

Biello was not present during Clark's legislative testimony.  Biello Dep., Doc. No. 122-7 at 56.  He "left the hearing shortly after it started" but received a text from Bucari containing Clark's written testimony.  *Id.*  Biello read Clark's testimony that same day.  *Id.*

Brierley finalized her investigation into Marilee Clark on February 28, 2020.  Brierley Memo, Doc. No. 117-10 at 6.  Brierley recommended that Biello should terminate Marilee Clark's employment after finding that she had engaged in misconduct.  *Id.* at 37.  Brierley made findings of fact that (a) Marilee Clark used her official position at the DRS to further her personal interests; (b) Marilee Clark's proposed legislative language was against the DRS's best interests and, if enacted, would negatively impact the DRS; (c) Marilee Clark was not authorized by the DRS Commissioner to propose that language; (d) Marilee Clark hid her actions from the

---

[4] Brierley also investigated Susan Sherman for misconduct.  *See* Biello Dep., Doc. No. 122-7 at 101.  Biello did not terminate Sherman's employment because "[t]he level of her misconduct wasn't even close to the level of misconduct of Attorney Clark."  *Id.*

DRS; and (e) Marilee Clark specifically targeted Bucari in her proposed legislation. *See generally* Brierley Memo, Doc. No 117-10 at 6-37; Termination Letter, Doc. No. 117-10 at 59-60; *see generally* ERB Board Decision, Doc. No. 117-10 at 91-100.

In her memo, Brierley spent half a page summarizing Clark's testimony. Brierley Memo, Doc. No 117-10 at 16. As a part of Brierley's investigative findings of fact, she briefly noted that Clark "provided testimony in support of the bill as written, and strongly objected to any change to Section 5 to protect Lou Bucari." *Id.* at 36 ¶ 117.

Jennifer Blum, the DRS's Labor Relations Specialist, conducted a *Loudermill* hearing in September, 2020. *See* Biello Dep., Doc. No. 122-7 at 68-69, 94. Biello did not attend the *Loudermill* hearing. *Id.* at 94.

Biello terminated Marilee Clark's employment on October 13, 2020. Doc. No. 117-10 at 59; *but see* Biello ERB Testimony, Doc. No. 122-14 at 13 (testifying that Marilee Clark was terminated in November 2020). Biello testified at his deposition that (1) the Brierley investigative memorandum and (2) the *Loudermill* hearing informed his decision to fire Marilee Clark. Biello Dep., Doc. No. 122-7 at 67-68.

Marilee Clark challenged her termination by filing a grievance with the Employee Review Board (ERB). *See generally* Doc. No. 117-10 at 38-57. She submitted briefing and evidence, was represented by counsel, called witnesses, and had the opportunity to cross-examine the state's witnesses. *See generally* ERB Testimony, Docs. No. 112-13–112-14. Biello testified before the ERB. Biello Dep., Doc. No. 122-7 at 107. Bucari did not testify. *Id.* The ERB upheld Marilee Clark's termination. *See generally* ERB Panel Decision, Doc. No. 117-10 at 91-109.

Marilee Clark appealed the ERB decision to the Connecticut Superior Court. *See generally* Superior Court Mem. of Decision, Doc. No. 117-10 at 126-43. The Superior Court dismissed Marilee Clark's appeal. *Id.* at 143.

B. Procedural History

I have previously written orders on the defendants' motion to dismiss Clark's original complaint and motion to dismiss Clark's Second Amended Complaint ("SAC"). In my order on the defendants' motion to dismiss the SAC, I allowed the following claims to proceed: (1) First Amendment infringement of the right of intimate association against Biello in his individual capacity; (2) First Amendment retaliation against Biello in his individual capacity; (2) conspiracy to deprive Clark of his First Amendment right to free speech against both defendants in their individual capacities; (4) conspiracy to deprive Clark of his First Amendment right to intimate association against both defendants in their individual capacities. Doc. No. 76 at 27.

II.    **Standard of Review**

A. Summary Judgment

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (nonmoving party must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d

Cir. 1992) (the court is required to "resolve all ambiguities and draw all inferences in favor of the

nonmoving party").  When a motion for summary judgment is properly supported by

documentary and testimonial evidence, the nonmoving party may not rest upon the mere

allegations or denials of the pleadings, but must present sufficient probative evidence to establish

a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v.

Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

　　"Only when reasonable minds could not differ as to the import of the evidence is

summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also

Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving

party submits evidence that is "merely colorable," or is not "significantly probative," summary

judgment may be granted.  *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties
> will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no genuine issue of material
> fact. As to materiality, the substantive law will identify which facts are
> material. Only disputes over facts that might affect the outcome of the suit
> under the governing law will properly preclude the entry of summary
> judgment. Factual disputes that are irrelevant or unnecessary will not be
> counted.

 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To present a "genuine" issue of

material fact, there must be contradictory evidence "such that a reasonable jury could return a

verdict for the non-moving party."  *Id.* at 248.

　　If the nonmoving party has failed to make a sufficient showing on an essential element of

his case with respect to which he has the burden of proof at trial, then summary judgment is

appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to

any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

Although the court is required to read a self-represented party's papers liberally and "interpret them to raise the strongest arguments that they suggest[,]" *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)) (cleaned up), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## III.    Discussion

### A.    Personal Involvement

"An individual may be held liable under §§ 1981 and 1983 only if that individual is personally involved in the alleged deprivation." *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (quoting *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004)) (cleaned up). As set forth below, only defendant Biello was personally involved in Clark's alleged civil rights violations.

#### 1.    *Bucari's Involvement*

The record indicates that Bucari was not involved in either the investigation into Marilee Clark or the decision to terminate her employment. Therefore, Bucari is entitled to judgment on Clark's claims.

8

Clark alleges that Marilee Clark was fired because of his legislative testimony, not because he filed the instant action. Clark Dep., Doc. No. 122-11 at 3 ("Q: . . . it says that Attorney Bucari was motivated to terminate Attorney Clark's employment in retaliation for your Free Speech. Can we agree that your claimed Free Speech is February 21, 2020 before the Legislature? A: Yes. Q: We're not referring to any other Free Speech? A: I believe the – no, we're not talking about any other Free Speech."). On the day that Clark testified before the legislature, Bucari looked on the state website to "see if Attorney Clark had filed anything." Bucari Dep., Doc. No. 117-5 at 12. He saw Clark's testimony and texted the testimony to Biello via his state-issued cell phone. *Id.*

Bucari's involvement ended there. *Id.* at 4-5 ("I played absolutely no role in the process of firing Attorney Clark. . . . Q: . . . [S]o no one told you what happened or what was happening at the time? . . . A: Absolutely not. . . . Biello came and said that we have an issue, *I'm keeping you out of it*, . . . and that was the end of it.") (emphasis added). Biello testified that Bucari had no input and played in role in the decision to investigate or terminate Marilee Clark. Biello Dep., Doc. No. 122-7 at 91 (Q: . . . What role, if any, did Mr. Bucari have in regard to Attorney Brierley's investigation? A: Attorney Bucari had no role whatsoever in any of this matter."); *id.* at 111 ("I told Attorney Brierley that Lou Bucari had nothing to do with the investigation so she didn't interview him. . . . He had nothing to do with the matter and I wanted him to be kept out of the matter. . . . I went to great lengths to do that."). The Brierley Memo notes the same. Brierley Memo, Doc. No. 117-10 at 40 n.7 ("It is critically important to note that Mr. Bucari played no role in the investigation of Ms. Clark, was not even interviewed as part of the investigation that was conducted, and played no role in any decisions made by the Acting Commissioner or DRS relative to Ms. Clark and her actions.").

Clark's own testimony suggests that Bucari was not involved in the decision to investigate and terminate Marilee Clark. "Q: What did [Bucari] do? A: I believe I alleged that he aided Mr. Biello in firing my wife . . . Q: Do you have any evidence . . .? A: I'm not sure that I currently have any direct evidence of that." Clark Dep., Doc. No. 117-8 at 8; *see also id.* at 38-40 (testifying that he has no evidence that Bucari conspired to terminate Marilee Clark).

Clark argues that "Bucari admits to collecting 'evidence' against Attorney Clark." Doc. No. 123 at 12. In the weeks following his legislative testimony, Clark submitted a FOI request to the DRS seeking "[t]o review records held by the Department" that "implicated a personnel matter within the Department[.]" Biello Affidavit, Doc. No. 117-10 at 3 ¶ 8. Bucari searched his records to see if he possessed any information that was responsive to Clark's FOI request. *See id.* ¶ 13. Bucari then "provid[ed] Ms. Plourde with those records retained by him that were responsive to [Clark's] request[.]" *Id.* Apart from searching for responsive information, there is no evidence that Bucari "collect[ed] 'evidence'" against Marilee Clark.

Plaintiffs suing under section 1983 must show that a defendant was personally involved in the alleged wrongful acts, not mere linkage in the chain of command. *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985). Bucari was not personally involved in the adverse employment actions taken against Marilee Clark, nor did he discuss Marilee Clark's investigation or termination with Biello. I therefore grant the defendants' motion for summary judgment as it pertains to Bucari.

## 2.  *Biello's Personal Involvement*

Defendant Biello also argues that he lacked sufficient personal involvement in the adverse employment actions taken against Marilee Clark.

Biello did not decide to investigate Marilee Clark for misconduct. Biello Dep., Doc. No. 122-7 at 47-48 (testifying that he was the first person to allege that Marilee Clark drafted inappropriate legislative language, but that the Office of Labor Relations ultimately decided to investigate Sherman and Clark). He did not conduct Marilee Clark's misconduct investigation nor attend her *Loudermill* hearing. *Id.* at 94; *see* Plourde Dep., Doc. No. 122-9 at 5. But Biello made the ultimate decision to terminate Marilee Clark after consulting with Human Resources and the Compliance Bureau Chief of Connecticut. Biello Dep., Doc. No. 122-7 at 69-70. Biello was therefore personally involved in the conduct underlying Clark's claims for relief.

### B. First Amendment Retaliation

To prevail on a First Amendment retaliation claim under section 1983, a private citizen like Clark must prove (1) "he has an interest protected by the First Amendment"; (2) the "defendants' actions were motivated or substantially caused by his exercise of that right; and" (3) the defendants' actions "adversely affected" his exercise of his First Amendment right or that he has suffered some other "concrete harm." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

Viewing the record in the light most favorable to Clark, there is no genuine dispute that Biello fired Marilee Clark because of her own misconduct and not because of Clark's legislative testimony. *See Anderson*, 477 U.S. at 255-56.

#### 1. *Clark Offers Insufficient Evidence of Prima Facie Causation*

To show causation, "a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action" either with direct evidence of retaliatory animus or "through a showing that the protected activity was followed closely by the adverse

action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (cleaned up).  Clark does not provide evidence of causation on either metric.

    a.   Direct Evidence of Animus

Biello made the sole decision to fire Marilee Clark.  Biello Dep., Doc. No. 122-7 at 69.[5] Biello testified at his deposition that he did not "care" about Clark's testimony.  *Id.* at 113 ("Q: . . . How did you feel about my [Clark's] testimony after you read it?  A:  To be honest with you, I didn't care. It didn't bother me in the least. You're a private citizen, you have the right to testify to what you feel and believe.").  Clark's legislative testimony played "absolutely" no role in Biello's decision to terminate Marilee Clark.  *Id.* at 70; *see also id.* at 72 ("Q:  Did you rely on my [Clark's] testimony during your decision?  A:  I've already testified absolutely not.  It was 100 percent unequivocally the conduct of Attorney Clark and Attorney Clark only."); *id.* at 108 ("Q:  Were you motivated to terminate Attorney Clark for Mr. Clark's speech at the legislature? A:  No.").

Clark argues that three pieces of evidence are probative of Biello's direct retaliatory animus against him.  I take each in turn.

    i.   <u>Biello Affidavit</u>

Clark filed a Freedom of Information request on March 4, 2020 to obtain DRS records. It is unclear exactly what Clark sought in his FOI request, but Clark seems to have sought human resource materials related to Marilee Clark.

---

[5] Before Biello decided to fire Marilee Clark, he consulted with Aimee Plourde in the Human Resources department and John Kutsukos, the Compliance Bureau Chief of Connecticut.  *Id.* at 69-70.

In Biello's view, the request "implicated a personnel matter within the" DRS.  Biello

Aff., Doc. No. 117-10 at 3 ¶ 8.  Biello denied the request because it related to a "personnel

dispute[]" about Marilee Clark:

> It must be noted and raised to the attention of the Freedom of Information Commission
> the existence of a personnel dispute concerning the Complainant's spouse. The
> Complainant's spouse has been dismissed as a result of conduct directed at Attorney
> Bucari. As the Freedom of information Commission is not the appropriate forum to
> address personnel disputes, *I view this request as a continuation of the conduct that led to
> her dismissal*.

Biello Aff., Doc. No. 117-10 at 4 ¶¶ 14-15 (emphasis added).

Relying on the Biello affidavit, Clark first argues that "Biello admits in [the] Affidavit

that Plaintiff's actions led to Attorney Clark's firing."  Doc. No. 123 at 13.  Clark assumes that

his legislative testimony was "the conduct that led to [Marilee Clark's] dismissal."  Biello Aff.,

Doc. No. 117-10 at 4 ¶ 15.  During Biello's deposition, Clark quoted paragraph 15 of the Biello

affidavit and asked, "What other conduct did I commit? . . . [Y]ou said that you viewed this

FOIA request as a continuation of conduct.  What conduct did I commit that it was a

continuation of?"  Biello Dep., Doc. No. 122-7 at 64.  Biello does not share Clark's

interpretation of his affidavit.  "Q:  Did you view my speech before the Judiciary Committee as

part of that conduct?  A:  No, I did not. . . . [T]he investigation focused and centered around

Attorney [Marilee] Clark's conduct.  That's what was at the heart of this matter[.]"  *Id.* at 67.

Clark furthermore argues that Biello's "admitted purpose to (sic) firing Attorney Clark

was to protect Bucari."  Doc. No. 123 at 12.  Biello wrote that Marilee Clark "has been dismissed

as a result of conduct directed at Attorney Bucari." Biello Aff., Doc. No. 117-10 at 4 ¶ 15.  Here,

Biello refers to Marilee Clark's proposed legislation that would have specifically targeted the

DRS role occupied by Bucari.  Biello did not fire Marilee Clark to protect Bucari;  he fired her

because she drafted legislation against the best interests of the DRS, while purporting to be

acting within the scope of her employment and hiding her actions from Biello against his direct orders.  *See generally* Brierley Memo, Doc. No 117-10 at 6-37; Termination Letter, Doc. No. 117-10 at 59-60; *see also* ERB Board Decision, Doc. No. 117-10 at 91-109.  No reasonable juror could interpret Biello's affidavit as evidence of retaliatory animus against Nathaniel Clark.[6]

   ii. <u>Biello's Employee Review Board Testimony</u>

  Clark next argues that Biello's testimony before the ERB board is direct evidence of retaliatory animus.  "Biello admits Plaintiff's actions resulted in Attorney Clark's firing. He even cited Plaintiff's testimony when asked what actions were 'directed at Bucari' in ERB testimony.'"  Doc. No. 123 at 12.

  At the ERB hearing, Biello was asked by the attorney for the state whether the Brierley investigative memo contained "any reference to Ms. Clark targeting Mr. Bucari in the findings of fact."  Biello ERB Testimony, Doc. No. 122-14 at 15.  Biello then reviewed the Brierley Memo. *Id.*  He listed all findings of fact that mentioned Bucari and Marilee Clark's discord, including, "Number 117[:] 'Marilee's husband, Nathaniel Clark, provided testimony in support of the bill as written and strongly objected to any changes to Section 5 to protect Louis Bucari.'"  *Id.* at 16.  Biello was then asked, "Some [of] those findings of fact you just read, those are what you believe shows that the investigator concluded Ms. Clark targeted Mr. Bucari?"  *Id.*  He answered, "Yes."  *Id.*

  During the ERB Hearing Biello merely summarized Brierley's findings of fact.  There is no evidence from the hearing that Biello himself harbored retaliatory animus against Clark for

---

[6] Clark additionally argues that the Biello affidavit is evidence of Bucari's retaliatory animus against Clark.  Doc. No. 123 at 12.  Bucari was not personally involved in Clark's FOI request beyond searching for responsive documents and thus cannot be held liable under section 1983.  *See* Biello Aff., Doc. No. 117-10 at 3 ¶ 13.

his legislative testimony.[7]  Viewing the record in the light most favorable to Clark, there is no

evidence that Biello harbored direct retaliatory animus against Clark.

       b.   Circumstantial Evidence: Disparate Treatment

Causation may be proven indirectly through disparate treatment of those who engaged in

similar activity.  *Clayton v. City of Middletown*, 564 F. Supp. 2d 105, 112 (D. Conn. 2008)

(quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  Clark argues

that other DRS employees were treated differently than Marilee Clark for their alleged role(s) in

the proposed legislation incident:

> There were three individuals within DRS who clearly knew about the Chapman
> language:[8] Ernest Adamo, Susan Sherman, and Attorney Clark.
>
> Only Attorney Clark, and Susan Sherman were walked out of the building. The
> Defendants could offer no explanation for why Mr. Adamo, the only man in the group,
> was not subject to investigation. Even though they produced emails from Mr. Adamo to
> them on the day the two women were walked out of the building, confirming he was
> aware of the Chapman language and involved in the process of updating the bill it was in
> relation to.
>
> Both Susan Sherman and Attorney Clark had recommended actions in their reports.
> Defendant Biello acted immediately on the recommendations, which were based, in part,
> on the Plaintiff's testimony, to fire Attorney Clark. He then waited for a new
> Commissioner to be appointed by the Governor to "have a conversion" (sic) with Ms.
> Sherman, which resulted in no formal punishment.

Opp. Mem. of Law, Doc. No. 123 at 11 (cleaned up).

Ernest Adamo was a DRS legislative liaison at the time of the incident.  Brierley Memo,

Doc. No. 117-10 at 20.  Clark claims that Adamo was aware of Marilee Clark's proposed

---

[7] Clark also alleges that the State of Connecticut's attempt to introduce the instant action into evidence in the ERB
process constitutes retaliatory animus.  SAC, Doc. No. 68 ¶ 45.  But the state's attempt to introduce Clark's lawsuit
into the ERB process is insufficient to show that Biello, as an individual, harbored retaliatory animus towards Clark.
There is no evidence that Biello, who merely testified as a witness, played any role in attempting to introduce the
lawsuit into evidence.
[8] "Chapman language" refers to the proposed legislation that Marilee Clark drafted and sent to a lobbyist, whose
name is Bill Chapman.  *See, e.g.*, Doc. No. 117-10 at 102-04.

legislation, but Clark does not provide any evidence of Adamo's own involvement in drafting or otherwise endorsing the proposed legislation.

Brierley investigated Susan Sherman for her role in the incident, but Biello did not fire Sherman. *See* Biello Dep., Doc. No. 122-7 at 60. Biello treated Sherman differently because Brierley's investigative memo came to a "vastly different conclusion[]" regarding Sherman. *Id.* at 62. "Miss Sherman and Attorney Clark were in vastly different positions at the Department." *Id.* Sherman worked under Marilee Clark. Brierley Memo, Doc. No. 117-10 at 21. She was a legislative liaison, not an attorney. *Id.*; Biello Dep., Doc. No. 122-7 at 101. According to Biello, "[t]he level of [Sherman's] misconduct wasn't even close to the level of misconduct of Attorney Clark." Biello Dep., Doc. No. 122-7 at 101.

Clark's disparate treatment argument is thus unpersuasive.

      c.   Circumstantial Evidence: Temporal Proximity

"Our Circuit has declined to draw a bright line as to how close in time" the protected speech and adverse employment action must be. *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019). "We have instead called on courts to exercise judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Id.* (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)) (cleaned up). "But at the summary judgment stage[,] temporal proximity alone is not enough." *Castagna v. Sansom*, 2024 WL 197462, at *12 (D. Conn. Jan. 18, 2024) (citing *Carr v. New York City Transit Auth.*, 76 F.4th 172, 182 (2d Cir. 2023)).

When an employee faces disciplinary action *before* the protected speech, temporal proximity—without more—cannot give rise to an inference of causation. *Id.* ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the

plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.")
(cleaned up); *see also Gonzalez v. NYU Langone Hosps.*, 2022 WL 4372199, at *1 (2d Cir. Sept.
22, 2022) (summary order); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir.
2001), *as amended* (June 6, 2001).  In analogous cases, disciplinary action occurred well before
the state employee's protected activity.  *Castanga*, 2024 WL 197462, at *2 (eighteen years);
*Gonzalez*, 2022 WL 4372199, at *2 (six years); *Slattery*, 248 F.3d at 95 (five months).  The DRS
suspended Marilee Clark eleven days before Clark's legislative testimony.  Before her
suspension, Marilee Clark had "never received a negative performance review and was not
subject to disciplinary actions."  ERB Findings of Fact, Doc. No. 117-10 at 94.  But the fact that
Marilee Clark was suspended prior to Clark's testimony strongly indicates that the motivation for
her discipline was not Clark's testimony.

The record indicates that Biello fired Marilee Clark because of her own misconduct, not
because of Clark's legislative testimony.  *See infra* Section III.B.2.  Clark offers only evidence of
temporal proximity.  To survive summary judgment, Clark must present some evidence of
causation in addition to temporal proximity.  *See Castagna*, 2024 WL 197462, at *12.  He has
not done so, and thus cannot meet his prima facie burden of showing causation.

2.  *The Defendants Rebut Any Prima Facie Showing of Causation*

"[A] defendant can rebut a prima facie showing of retaliation by demonstrating by a
preponderance of the evidence that it would have taken the same adverse employment action
even in the absence of the protected conduct."  *Heim v. Daniel*, 81 F.4th 212, 222 (2d Cir. 2023)
(quoting *Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011)) (internal quotation marks omitted).
The defendants present overwhelming evidence that Marilee Clark would have been fired with or
without Clark's legislative testimony.

Before Biello terminated Marilee Clark, he consulted (1) the Brierley investigative memo and (2) the *Loudermill* hearing transcript and associated materials.  *See* Biello Dep., Doc. No. 122-7 at 67-68.  The Brierley Memo found that Marilee Clark committed thirteen policy violations of the DRS Code of Ethics, DRS General Rules of Conduct, and Connecticut State Agency Regulations, § 5-240-1a(c).  Brierley Memo, Doc. No. 117-10 at 37.  The Memo focused its discussion almost exclusively on Marilee Clark's actions.  *See generally id.* at 6-37.  It briefly mentioned Clark's legislative testimony in the findings of fact.  *Id.* at 36 ¶ 117 (noting that Clark "provided testimony in support of the bill as written, and strongly objected to any change to Section 5 to protect Lou Bucari.").  No reasonable juror could find that Biello fired Marilee Clark because of the Brierley Memo's brief mention of Clark's legislative testimony.

The ERB Panel upheld Marilee Clark's termination and found that she had engaged in "two levels of serious misconduct:  First, [her] continuing failure to comply with the clear instructions of Acting Commissioner Biello and second[,] her personal motives in drafting proposed legislation."  ERB Order, Doc. No. 117-10 at 107.  The Superior Court then found "substantial evidence . . . to sustain the ERB's decision."  Superior Court Decision, Doc. No. 117-10 at 136.  The Court found "just and reasonable cause for Ms. Clark's termination on the basis of insubordination and Ms. Clark's proposing legislation for the purpose of furthering her own interests[.]"  *Id.* at 136-37.

Marilee Clark would have been terminated even if Clark had not testified before the legislature on February 21, 2020.  Marilee Clark was therefore "placed in no worse a position than if [Clark] had not engaged in the conduct."  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-86 (1977); *contra Heim*, 81 F.4th at 223 (holding that it would have been "impossible for a reasonable jury to conclude that Defendants would have taken the same

action in the absence of" the plaintiff's speech when the speech "was central to Defendants' assessment of his qualifications") (cleaned up).

### 3. *First Amendment Retaliation: Lawsuit*

After Marilee Clark was fired, and after Clark filed the instant action, Clark claims that Biello retaliated against him two more times.  First, Clark points to the State of Connecticut's attempt to leverage the instant action against him during Marilee Clarks ERB hearing.  SAC, Doc. No. 68 ¶ 45.  Second, Clark claims that Biello retaliated against him for bringing this lawsuit by filing a state grievance complaint for attorney discipline against Marilee Clark. *Id.* ¶¶ 46-50.

### a. ERB Process

Clark first argues that "the State, in representing the interests of the Defendants, attempted to introduce Plaintiff's federal lawsuit . . . into evidence against Attorney Clark" in the ERB administrative hearing.  *Id.* ¶ 45.[9]  But Clark inappropriately imputes the state's attorney's actions onto Biello.  Clark sues Biello in his individual capacity, not in his official capacity.  *See* Doc. No. 76 at 27.  Biello testified as a witness during the ERB Hearing, but he was not a party to the ERB proceedings, nor was he represented by counsel.  Biello Dep., Doc. No. 122-7 at 104-05.  There is no evidence that Biello had anything to do with the attorney's attempt to introduce this lawsuit into evidence.[10]

---

[9]  Neither Clark nor the defendants have provided any evidence that the state attempted to introduce Clark's lawsuit into evidence at either the ERB Hearing or the *Loudermill* hearing.

[10] The defendants alternatively argue that the litigation privilege insulates Biello for any statements he made during the ERB hearing.  I do not reach that issue because Biello did not make retaliatory statements about the Clarks during the ERB Hearing or the *Loudermill* hearing.

Furthermore, the ERB hearing occurred about a year after Marilee Clark was terminated. *See* Doc. No. 122-14 at 1. Any attempt to introduce the instant action into evidence before the ERB is irrelevant to the reasons for why Biello fired Marilee Clark.

      b.   State Bar Grievance Complaint

Clark brought the instant action on October 15, 2021, about one year after Marilee Clark was terminated. Doc. No. 1. The DRS, directed by Biello, submitted a grievance against Marilee Clark a few months after Clark filed this lawsuit. Doc. No. 122-7 at 30. Biello submitted the grievance without consultation from anyone else. *Id.* at 30-31.

Biello testified at his deposition that the Clark's lawsuit did not influence him "whatsoever" when he submitted the bar grievance. *Id.* at 88 ("Was there any relationship between Mr. Clark filing a federal lawsuit, which named you individually, and . . . you on behalf of DRS, filing this Bar Grievance? A: None whatsoever."). Clark offers no evidence suggesting otherwise. He relies on temporal proximity, but "at the summary judgment stage[,] temporal proximity alone is not enough." *Castagna*, 2024 WL 197462, at *12.

*　　*　　*

Viewing the record in the light most favorable to Clark, there is no genuine dispute that Biello fired Marilee Clark and submitted a bar grievance complaint against her because of her own misconduct. Clark presents insufficient affirmative evidence of causation, an essential element of his First Amendment retaliation claim. *See Dorsett*, 732 F.3d at 160. I therefore grant the defendants' motion for summary judgment on Count One, First Amendment retaliation.

C.  <u>First Amendment Intimate Association</u>

The defendants re-raise several arguments in their summary judgment motion that I have already ruled on, with prejudice, regarding Clark's First Amendment intimate association claim.

20

I first dismissed Clark's intimate association claim to the extent it arose under the Fourteenth Amendment.  Doc. No. 76 at 19-20.  I previously held that Clark's loss of consortium allegations in his Second Amended Complaint exist under the same umbrella as his First Amendment intimate association claim.  *See id.* at 20.  Intimate association claims arising under the First Amendment are cognizable under section 1983.  *See Adler v. Pataki*, 185 F.3d 35, 44 (2d Cir. 1999); *see also Jones v. Bay Shore Union Free Sch. Dist.*, 947 F. Supp. 2d 270, 277 n.2 (E.D.N.Y. 2013).

I next held that Clark's intimate association claims are not purely derivative of any claim that Marilee Clark could bring on her own.  Doc. No. 76 at 15.  "Clark alleges direct claims for injuries arising from Defendants' interference with his constitutional right to intimate association.  Clark's direct claims are, of course, distinct from any claim that he may or may not assert on behalf of his wife."  *Id.*  For those reasons, I held—and hold now—that Clark has standing to proceed on his First Amendment intimate association claim.

I now turn to the merits.

1. *Intimate Association Causation*

Clark brings an intimate association claim under the First Amendment that Marilee Clark was fired in retaliation for his legislative testimony.  To defeat the defendants' summary judgment motion, Clark must present affirmative evidence that Biello acted for the intended purpose of harming the Clark's marriage.  *See Miron v. Town of Stratford*, 976 F. Supp. 2d 120, 150 (D. Conn. 2013).  An intimate association claim cannot proceed beyond summary judgment if the state's actions merely impacted the plaintiff's relationship.  *See id.* at 150-51 (collecting cases); *id.* (granting, in part, the defendants' summary judgment motion when the plaintiff "ha[d] not provided particularized admissible evidence in the cited record that his background report

was released because of his sibling relationship with his brother, as opposed to his inherent unsuitability and lack of qualifications for the job").

As discussed above, a reasonable jury could only find that Biello fired Marilee Clark because of her own misconduct.  Biello testified at his deposition that he did not investigate and terminate Marilee Clark with the intention to interfere with Clark's marriage:

> Q:  Were any of your actions taken to harm Mr. Clark's intimate association?
> A:  No, definitely not.
> Q:  Were any of your actions taken to cause Mr. Clark marital discord?
> A:  No, absolutely not.
> Q:  Do you know anything about Mr. Clark's marriage?
> A:  I do not, no.

Biello Dep., Doc. No. 122-7 at 108-09.

 Clark does not provide any evidence that Biello fired Marilee Clark for the purpose of interfering with his marriage.  I therefore grant the defendants' motion for summary judgment regarding Count Three, First Amendment interference with the right of intimate association.

D.  Conspiracy Claims

Clark brings two conspiracy claims.  He alleges that Bucari and Biello conspired with each other to terminate Marilee Clark in retaliation for Clark's protected speech and for the purpose of interfering with Clark's right to intimate association with his spouse.  SAC, Doc. No. 68 ¶¶ 25-29.[11]

When there has been no substantive violation of a federal right, the associated section 1983 conspiracy claim necessarily fails.  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).  Because I grant the defendants' summary judgment motion regarding the First

---

[11] Plaintiffs may bring a section 1983 claim for conspiracy to violate one's constitutional rights against when a state employee conspires with a private individual.  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).  Even though other individuals were involved in Marilee Clark's investigation and termination, Clark's conspiracy allegations in his second amended complaint only involve Bucari and Biello.

Amendment retaliation and interference with intimate association claims, I also grant summary judgment on the associated conspiracy claims.

Furthermore, no reasonable jury could find that the defendants conspired to deprive Clark of his constitutional rights. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). On February 21, 2020, Bucari texted Clark's legislative testimony to Biello. Bucari Dep., Doc. No. 117-5 at 12. Thereafter, Biello made a conscious effort to keep Bucari out of Marilee Clark's misconduct investigation. Biello Dep., Doc. No. 122-7 at 91, 111; *see also* Bucari Dep., Doc. No. 117-5 at 4-5 ("I played absolutely no role in the process of firing Attorney Clark.").

Viewing the record in the light most favorable to Clark, the defendants did not conspire with each other, or anyone else, to target Clark because of his First Amendment activity. I therefore grant the defendants' motion for summary judgment on Clark's conspiracy claims, Counts Two and Four.

E.  Remaining Arguments

The defendants also raise arguments under qualified immunity and collateral estoppel.

I do not reach qualified immunity because the defendants have not violated Clark's federal or constitutional rights. "[F]urther inquiry is unnecessary because where there is no viable constitutional claim, defendants have no need of an immunity shield." *See Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013).

With respect to collateral estoppel, the Connecticut Superior Court only decided the issue of whether Marilee Clark was terminated for cause. Collateral estoppel applies when an

"issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim." *Peterson v. iCare Mgmt.*, LLC, 203 Conn. App. 777, 790 (2021) (cleaned up). The issue "must have been actually decided and the decision must have been necessary to the judgment." *Id.* (cleaned up). The Superior Court reviewed the ERB's decision to sustain Marilee Clark's for reasonable cause and determined that there was "substantial evidence in the record supporting the ERB's decision[.]" *Clark v. Connecticut Empls. Rev. Bd.*, 2023 Conn. Super. LEXIS 2307, at *1 (Super. Sep. 14, 2023). The Court did not reach the issue of whether Clark's legislative testimony was a substantial motivating factor in Marilee Clark's termination. *See generally id.* It appears that the parties did not raise that issue. *See generally id.*; DRS Grievance Br., Doc. No. 117-10 at 38-57; Marilee Clark Grievance Br., Doc. No. 117-10 at 61-71; ERB Decision, Doc. No. 117-10 at 91-109.

The defendants rely on *Scuderi-Hunter v. Merklen*, 2024 WL 1005793 (2d Cir. Mar. 8, 2024) (summary order). That case is inapplicable. The employee-plaintiff was precluded from litigating his First Amendment retaliation claim after he argued that claim in his administrative appeal before a New York state court. *Id.* at *2. Marilee Clark advanced neither a First Amendment retaliation claim nor any derivative First Amendment issues during her administrative hearings and appeals.

Finally, at oral argument on this motion, Clark objected to my use of testimony from CHRO proceeding(s) involving Marilee Clark. Mot. Hr'g Tr., Doc. No. 137 at 13:02-16:13; *see also* Doc. No. 133 at 2. That information is not before the Court. The CHRO testimony, CHRO decision(s), and CHRO settlement(s) played no role in my consideration of this motion.

**IV.     Conclusion**

For the foregoing reasons, I **grant** the defendants' summary judgment motion.  I direct the Clerk to enter judgment in favor of Biello and Bucari against Clark.

So ordered.

Dated at Bridgeport, Connecticut, this 12th day of February 2025.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge